**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT
EASTERN DIVISION**

| | | |
|---|---|---|
| DIONLASHAON WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25-cv-14364 |
| | ) | |
| JOSEPH VECCHIO, MARIO FUENTES, | ) | Hon. John F. Kness |
| NICU TOHATAN, AND CITY OF | ) | Mag. Albert Berry, III |
| CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER TO COMPLAINT

Defendants MARIO FUENTES and NICU TOHATAN by and through their attorneys, Johnson & Bell, Ltd., and for their answer to Plaintiff's Complaint, state as follows:

### JURISDICTION AND VENUE

1.      This action arises under the Constitution of the United States, particularly the Fourth Amendment to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Illinois.

**ANSWER**:    **Defendants admit this action includes claims are based on 45 U.S.C. §§ 1983 and 1988 and the law of the State of Illinois.**

2.      The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

**ANSWER**:    **Defendants admit that the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.**

3. This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the Federal claims. Venue is proper under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

**ANSWER**: **Defendants admit that the jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331and 1367 and that venue is proper under Title 28 United States code § 1391(b)(2).**

## PARTIES

4. At all times relevant herein, Plaintiff DIONLASHON WASHINGTON ("Dionlashon") was a resident of the County of Cook, State of Illinois.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

5. Defendants VECCHIO, FUENTES, and TOHATAN, ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

**ANSWER**: **Defendants admit that they are being sued in their individual capacities, that they were sworn police officers employed by the City of Chicago at all times relevant, acted within the scope of said employment with the City of Chicago and under the color of law.**

6. Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois. The CITY OF CHICAGO is responsible for the actions of its employees while acting

within the scope of their employment. At all times relevant to this action, CITY OF CHICAGO

was the employer of Defendants VECCHIO, FUENTES, and TOHATAN.

**ANSWER**:    **Admitted.**

## FACTUAL ALLEGATIONS

7.      On September 23, 2024, at approximately 9:30 p.m., Dionlashon was in the front

passenger seat of his friend Ron Hampton's car near the intersection of North Dearborn Street and

West Superior Street in Chicago. Ron was looking for parking before going to the Lifetime Fitness

gym, when Defendant Officers initiated their emergency lights and pulled them over.

**ANSWER**:    **Defendants admit that a car war was pulled over at that location at that**

**approximate date and time.  Defendants lack knowledge or information sufficient to form a**

**belief as to the truth of the remaining allegations contained in this paragraph.**

8.      No one in the car was committing any traffic violations.

**ANSWER**:    **Defendants deny the allegations contained in this paragraph.**

9.      Dionlashon and his friends are black.

**ANSWER**:    **Defendants admit, on information and belief, that the occupants of the vehicle**

**in question were black.  Defendants lack knowledge or information sufficient to form a belief**

**as to the truth of the remaining allegations contained in this paragraph.**

10.      Defendant Tohatan approached Ron's side of the vehicle and immediately said,

"Hands! Let me see your hands."

**ANSWER**:    **Defendants admit that an officer said those words during the traffic stop.**

**Defendants lack knowledge or information sufficient to form a belief as to the truth of the**

**remaining allegations contained in this paragraph.**

11.     Ron complied with Tohatan's command and placed both hands outside Ron's side window and after a brief exchange was asked to step out of the car.

**ANSWER**:     **Defendants admit that the driver of the vehicle put his hands outside the window, and was later asked to stop out of the car.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

12.     Tohatan then asked Ron whether the vehicle belonged to him. He responded that it did, and Tohatan asked him for his driver's license and insurance.

**ANSWER**:     **Defendants admit that an officer asked the driver of the vehicle whether the vehicle was his.  Defendants deny that this paragraph accurately captures the sequence of what was said during the occurrence.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

13.     Ron, visibly confused, replied that his license and insurance were in his bag in the trunk and asked what was going on.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

14.     Tohatan responded that he was not wearing a seatbelt, to which Ron replied that he had just taken it off.

**ANSWER**:     **Defendants admit that the driver of the vehicle admitted he was not wearing his seatbelt.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

15.     Tohatan instructed Ron to turn off the car and step out, telling him not to reach for anything. Ron replied that he did not have anything. Tohatan asked whether there were any weapons in the vehicle, and Ron again stated that he did not have anything.

**ANSWER**:     **Defendants deny that this paragraph accurately captures what was said during the occurrence.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

16.     Despite the absence of any reason to believe Ron was armed or dangerous, Tohatan patted Ron's waist area and stated that he was detaining him for safety, but that he was not under arrest, and then proceeded to handcuff him.

**ANSWER**:     **Defendants admit the driver of the vehicle was handcuffed, and that an officer patted his waist area, and stated the driver was being detained for safety and was not under arrest.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

17.     At one point, no fewer than four squad cars were present at the scene, and at least six additional officers, aside from the Defendant Officers, were also on scene.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of allegations of this paragraph.**

18.     Tohatan next asked the left-rear passenger to step out of the vehicle and conducted a pat-down search of him.

**ANSWER**:     **Defendants admit that the left-rear passenger was asked to step out of the vehicle and his waist was patted down.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

19.     Tohatan then ordered the middle-seat passenger to step out and asked her whether she had any weapons. She denied having any weapons, and Tohatan directed her to shake her sweater.

**ANSWER**:     **Defendants admit that another passenger was asked to step out of the vehicle and was asked to shake her sweater.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

20.     At this point, the Defendant Officers had no reasonable suspicion or probable cause to believe that Ron or any of his passengers had committed any crime.

**ANSWER**:     **Denied.**

21.     At the same time, Defendant Fuentes approached the front passenger side of the vehicle, opened the door, and told Dionlashon, who had his phone in his hand, to step out, stating, "Nothing in your hands," and "The last thing we want is for you to start reaching for stuff."

**ANSWER**:     **Defendants admit that words to this effect were said at our near the front passenger door of the car.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

22.     Dionlashon, visibly confused, asked why he needed to step out. Fuentes responded, "Because we're telling you to, and if you don't want to come out, we'll take you to jail."

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

23.     Dionlashon complied with Fuentes's orders.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

24.     Defendant Vecchio asked Dionlashon whether he had anything on him; he denied having anything, and Vecchio conducted a pat-down search.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

25.     Fuentes then directed the right-rear passenger to exit the vehicle, and Vecchio immediately handcuffed him to Dionlashon.

**ANSWER**:     **Defendants admit that two of the vehicle's passengers were handcuffed together.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

26.     One of the passengers asked the Defendant Officers to explain what the issue was, and one of the officers responded, "You were double-parked and you were going in circles."

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

27.     The right-rear passenger asked what was going on, and Vecchio told him they were being detained for the purpose of a traffic stop.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

28.     Ron explained to the Defendant Officers that he and his friends were going to the nearby Lifetime Fitness.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

29.     The reason the vehicle was double-parked was because Defendant officers had pulled it over.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

30.    Tohatan again asked Ron for his driver's license, and Ron instructed him where his wallet was in the trunk.

**ANSWER**:    **Defendants admit that the driver of the vehicle stated that his wallet was in the trunk in a bag.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

31.    Tohatan returned to his squad car to run Ron's information.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

32.    Vecchio proceeded to search the vehicle, including multiple gym bags, the center console, the glove compartment, and the trunk.

**ANSWER**:    **Defendants admit that the vehicle and items inside it were searched. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.**

33.    Vecchio searched Dionlashon's backpack that was in the front passenger area.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

34.    Dionlashon did not consent to any search of his backpack or his person.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

35.    Ron gave Tohatan permission to open his trunk to retrieve his driver's license, but did not consent to any searches of his car.

**ANSWER**: Defendants admit that one of the vehicle's occupants gave permission for officers to open the trunk. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

36. After running Ron's information, Tohatan returned and asked him whether he had a FOID card. Ron responded that he did but reiterated that he had no weapons in the vehicle.

**ANSWER**: Defendants admit that an officer asked one of the vehicle's occupants whether he had an FOID card, and that occupant said that he did. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

37. Dionlashon and his friends were eventually unhandcuffed.

**ANSWER**: Defendants admit that the occupants of the vehicle were unhandcuffed. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph.

38. No firearms were found inside the vehicle.

**ANSWER**: On information and belief, admitted.

39. Defendant Officers left the scene without initiating any charges or issuing a parking ticket.

**ANSWER**: On information and belief, admitted.

40. Defendant Officers failed to provide a stop receipt as required by the Chicago Police Department rules.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.

41.    On information and belief, Defendant Officers failed to generate an Investigatory Stop Report as required by CPD rules.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

42.    As a result of the foregoing, Dionlashon was deprived of rights secured by the Fourth Amendment to the United States Constitution, as well as Illinois law.

**ANSWER**:    **Denied.**

## DEFENDANT OFFICERS' HISTORY OF MISCONDUCT

43.    Since this incident, Defendants Vecchio, Fuentes, and Tohatan have been relieved of their police powers due to multiple investigations into serious allegations of police misconduct.

**ANSWER**:    **Defendants admit they have been relieved of their police powers. Defendants deny the remaining allegations in this paragraph.**

44.    Defendants Officers already have extensive histories of sustained allegations of misconduct.

**ANSWER**:    **Denied.**

45.    Defendant Officers were all members of the 1863 tactical team, which has been the subject of numerous investigations by the Civilian Office of Police Accountability ("COPA").

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph.**

46.    In December 2024, COPA sent a memorandum to the Chicago Police Department identifying patterns of concern involving Defendant Officers and the 1863 tactical team. These included "unprofessional and disrespectful conduct towards civilians, including the use of profanities, insults, and threats of force"; the use of pretextual traffic stops for reasons such as

stopping too far away from the curb, stopping in a non-parking zone, and seatbelt violations"; and "a consistent failure to adhere to CPD policies regarding the documentation and recording of civilian/police encounters, including to complete ISRs and TSSS cards, failing to provide ISR receipts, and late BWC activations."

**ANSWER**:     **Defendants lack knowledge or information sufficient to understand Plaintiff's intended meaning of "patterns of concern" and are therefore unable to form a belief as to the truth as to the allegation that "COPA identified patterns of concern involving Defendants Tohatan and Fuentes and the 1863 Tactical Team. Answering further, Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

47.     In October 2025, COPA issued a separate memorandum to CPD regarding Vecchio, recommending that Vecchio be relieved of his police powers pending the resolution of COPA's investigations.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

48.     COPA also noted that Vecchio had the highest number of complaints – also known as log numbers – in the Chicago Police Department (76 log numbers), Tohatan had the third-highest number of complaints (46 log numbers), and Fuentes had the fourth-highest number of complaints (43 log numbers).

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

49.     The average Chicago Police Department member has 3.5 log numbers.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

50.     The majority of the complaints and investigations involve allegations of unjustified traffic stops, arrests, searches, and disrespectful or unprofessional conduct.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

51.     Additionally, COPA is investigating cases in which Vecchio allegedly provided false statements and/or testimony. Both incidents involved traffic stops during which Vecchio recovered a firearm during a vehicle search.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

### LAWSUITS AGAINST DEFENDANT OFFICERS

52.     Defendant Officers are no strangers to being accused of unlawful conduct similar to the conduct described in this complaint.

**ANSWER**: **Denied.**

53.     In *Wilson v. Vecchio* (24-cv-12371), Defendant Vecchio was accused of approaching the plaintiff's stopped car for a minor parking violation, unlawfully searching the plaintiff's vehicle, unlawfully detaining the plaintiff, using excessive force against the plaintiff, and denying the plaintiff equal protection.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

54.     The City settled *Wilson* for $80,000.

**ANSWER**:      **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

55.     In *Northington v. Tohatan et al.* (24-cv-11466), Defendants Tohatan, Vecchio, and Fuentes were accused of approaching the plaintiff's stopped car for a minor parking violation, pulling him out of his car, handcuffing and detaining him, searching his car, mocking, insulting, and threatening him before walking away and authoring a falsified stop report.

**ANSWER**:      **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

56.     The City settled *Northington* for $80,000.

**ANSWER**:      **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

57.     In *Ipaye v. City of Chicago et al.* (24-cv-8958), Defendants Vecchio and Tohatan were accused of searching the plaintiff's vehicle and person without consent or probable cause.

**ANSWER**:      **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

58.     The City settled *Ipaye* for $80,000.

**ANSWER**:      **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

59.     In *Haley v. Tohatan, et al.* (22-cv-1785), Defendant Tohatan was accused of unlawful search and seizure after he and another officer approached a stopped vehicle on West Erie Street on December 8, 2021.

**ANSWER**:      **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

13

60. The plaintiff in *Haley* alleged that Tohatan ordered him out of his car, handcuffed him, and searched his car despite there being no probable cause or reasonable suspicion of any criminal conduct.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

61. The City settled *Haley* for $38,000.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

62. In *Partee v. Hasan* (19-cv-3689), Defendant Tohatan and two other officers were accused of handcuffing the plaintiff and searching his car despite the fact that the plaintiff had done nothing illegal.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

63. The City settled *Partee* for $40,000.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

64. In *Farris v. City of Chicago et al.* (22-cv-1729), Defendants Tohatan and Fuentes were accused of excessive force, unlawful search, wrongful detention, and malicious prosecution after they approached a stopped vehicle.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

65. The City settled *Farris* for $100,000.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

66. In *Garcia v. Vecchio et al.* (25-cv-13109), Defendants Vecchio, Tohatan, and Fuentes are accused of unlawfully searching the plaintiff without reasonable suspicion or probable cause.

**ANSWER**: **Defendants admit they have been named as Defendants in *Garcia v. Vecchio et al*. (25-cv-13109). Defendants deny the remaining allegations in this paragraph.**

67. The *Garcia* lawsuit remains pending.

**ANSWER**: **Admitted.**

68. In *Quinn v. Vecchio et al.* (25-cv-10782), Defendants Vecchio is accused of searching the plaintiff's vehicle without consent or probable cause leading to plaintiff's false arrest. Vecchio is accused of falsifying reports and offering perjured testimony regarding the stop.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

69. The *Quinn* lawsuit remains pending.

**ANSWER**: **Admitted.**

70. The cases cited above are just the tip of the iceberg when it comes to lawsuits against Chicago police for unlawful stops and searches.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

71. The city has paid millions of dollars in settlements of lawsuits alleging unlawful traffic and investigatory stops and illegal searches.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

72.     As just one example, the City's Law Department agreed to pay the family of Dexter Reed $1.25 million to settle their lawsuit arising from an illegal, pretextual stop of Reed by Chicago police which resulted in the death of Reed and the wounding of an officer.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

### DEFENDANT VECCHIO'S DISCPLINARY HISTORY

73.     Defendant Vecchio has been disciplined for similar conduct in the past.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

74.     COPA sustained numerous allegations against Vecchio, including a domestic incident that resulted in a 15-day suspension, and two cases involving reporting/documentation violations that resulted in a 2-day suspension and a reprimand.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

75.     Further, Vecchio's closed log number investigations reveal preliminary findings of misconduct in more than half of his cases.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

### DEFENDANT FUENTES' DISCIPLINARY HISTORY

76.     Defendant Fuentes has been disciplined for similar conduct in the past.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

77. On May 30, 2023, COPA sustained allegations against Defendant Fuentes and another officer of using profanity against a civilian at a traffic stop, unlawfully detaining the civilian, and unlawfully impounding the civilian's vehicle.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

78. During the incident, Fuentes ordered Ron out of the car and handcuffed him, telling him his car would be towed. Fuentes yelled at the man, "Your $50,000 car is my car now! No, no, it's my car now! It's my car now! My car now! My car!"

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

79. Fuentes later claimed he searched the car because he smelled burnt cannabis. But the search yielded no narcotics or other contraband.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

80. The officers issued the civilian a citation for parking in a tow zone, and ordered his car towed under a provision of the City of Chicago ordinances that authorized towing "[w]hen an unattended vehicle is parked illegally" in a marked tow zone.

**ANSWER**: **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

81. The civilian was found "not liable" by the administrative law judge on his citation – presumably because his car was not unattended.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

82.    COPA recommended that Fuentes receive a 45-day suspension for his conduct.

**ANSWER**:    **Denied.**

83.    The Chicago Police Department concurred with COPA's findings but felt Defendant Fuentes should receive only a 10-day suspension.

**ANSWER**:    **Admitted.**

84.    On January 16, 2024, COPA sustained allegations that Defendant Fuentes "made insulting, mocking and belittling statements" toward two civilians at a traffic stop, and that he arrested a civilian and impounded his vehicle as retaliation for the civilian looking at Fuentes' identification.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

85.    At several points during the stop, Fuentes told the civilians that they were "ignorant as fuck" and commented to a fellow officer that one of the civilians was a "jag," which Fuentes later admitted was shorthand for "jagoff."

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

86.    When Fuentes observed the civilian looking at his star number and squad car, Fuentes said, "You are not going to size me up like that, looking at my star number and my vehicle number."

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

87.     The COPA investigator noted in his report that "[d]espite Fuentes claiming in his interview that he felt [one of the civilians] was disrespectful and did not respect their authority, only Fuentes is captured acting in a disrespectful manner."

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

88.     COPA recommended a 10-day suspension for Fuentes as a result of his conduct.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

89.     On January 23, 2024, COPA sustained allegations that Defendant Fuentes and another officer used profanity and racist language toward African-American civilians during a traffic stop.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

90.     During the traffic stop, Fuentes told another officer, "I'm tired of these fucking people acting like animals, dude," and referred to the civilians as "fucking animals."

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

91.     Fuentes' conduct was captured on body-worn camera footage.

**ANSWER**:     **Admitted.**

92.     COPA recommended a suspension of up to 30 days for Fuentes.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

93.     On April 5, 2024, the Chicago Police Department concurred with COPA's findings and its recommended penalty of a 30-day suspension for Defendant Fuentes.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

### DEFENDANT TOHATAN'S DISCIPLINARY HISTORY

94.     On November 27, 2018, COPA sustained allegations that Defendant Tohatan engaged in an unjustified verbal altercation with a civilian, illegally searched the civilian's car, and improperly issued a citation to the civilian for no proof of insurance despite the civilian offering to show him proof of insurance on his phone.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

95.     The incident began when Tohatan and another officer pulled the civilian over after doing a U-turn.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

96.     COPA recommended a 7-day suspension for Defendant Tohatan.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

97.     On August 25, 2020, COPA sustained an allegation that Defendant Tohatan engaged in verbal abuse.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

98.     Tohatan was suspended for 5 days as a result of his misconduct.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

99.     On December 20, 2022, COPA sustained allegations that Defendant Tohatan engaged in verbal abuse and profanity.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

100.    Defendant Tohatan was suspended for 5 days as a result of his misconduct.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

101.    On April 11, 2023, COPA sustained allegations that Defendant Tohatan engaged in an undisclosed civil rights violation.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

102.    Tohatan was reprimanded for his misconduct.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

103.    On December 14, 2023, COPA sustained allegations that Defendant Tohatan engaged in undisclosed misconduct during a traffic stop.

**ANSWER**:     **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

104.    On an unknown date, COPA sustained allegations against Defendant Tohatan of Coercion Threat of Arrest/Charges Coerced Confession.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

105.    The discipline cited above is just the tip of the iceberg when it comes to discipline against Chicago police officer for unlawful stops and searches and verbal abuse of civilians.

**ANSWER**:    **Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

## AFFIRMATIVE DEFENSES

Defendants' investigation of the facts alleged in Plaintiff's Complaint is ongoing, and, accordingly, Defendants reserve the right to assert additional affirmative defenses in the future. Notwithstanding the foregoing, Defendants state the following affirmative and other defenses:

## FIRST AFFIRMATIVE DEFENSE
### (Qualified Immunity)

Defendants are government officials, namely police officers, who performed discretionary functions. At all times material to the events alleged in Plaintiff's Complaint, a reasonable police officer objectively viewing the facts and circumstances that confronted defendants could have believed his actions to be lawful, in light of clearly established law and information that Defendants possessed. Therefore, Defendants are entitled to qualified immunity as to the Plaintiff's claims.

## SECOND AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

Plaintiff had a duty to mitigate his damages, and any damages awarded to Plaintiff would be required to be reduced by any amount by which the damages could have been lessened by Plaintiff's failure to take reasonable action to minimize those damages.

### THIRD AFFIRMATIVE DEFENSE

Under 745 ILCS 10/2-202 of the Tort Immunity Act, "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." Defendants were public employees executing and enforcing the law at all relevant times and did not act "willfully and wantonly" while doing so. Plaintiff's state law claims against Defendants are therefore barred under 745 ILCS 10/2-202.

### FOURTH AFFIRMATIVE DEFENSE

Defendants are immune from Plaintiff's state law claims under 745 ILCS 10/2-201 of Illinois Tort Immunity Act. Under 10/2-201 of the Tort Immunity Act, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

### FIFTH AFFIRMATIVE DEFENSE

Under 745 ILCS 10/2-204 of the Tort Immunity Act, "[e]xcept as otherwise provided by statute, a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." Plaintiff's state law claims against Defendants that are based on evidence of acts or omissions of other persons are barred under 745 ILCS 10/2-204.

### SIXTH AFFIRMATIVE DEFENSE

Under 745 ILCS 10/2-208 of the Tort Immunity Act, "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause."

Defendants were public employees acting within the scope of their employment and to the extent they were involved in instituting or prosecuting any judicial or administrative proceeding, they did not do so maliciously and without probable cause. Plaintiff's state law claims against Defendants are therefore barred under 745 ILCS 10/2-208.

### SEVENTH AFFIRMATIVE DEFENSE

Defendants are entitled to absolute immunity for any and all testimony provided during the underlying criminal court proceedings. *Briscoe v. Lahue*, 460 U.S. 325 (1983), see also, *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2015).

### <u>JURY DEMAND</u>

Defendant demands a trial by jury.

Dated: February 3, 2026

Respectfully Submitted,

By:     */s/ Lisa M. McElroy*

One of the attorneys for Defendants
Mario Fuentes and Nicu Tohatan

Brian P. Gainer (gainerb@jbltd.com)
Lisa M. McElroy (mcelroyl@jbltd.com)
Jack A. Gainer (gainerj@jbltd.com)
**JOHNSON & BELL, LTD.**
33 W. Monroe St., Ste. 2700
Chicago, Illinois 60603
(312) 372-0770