**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DIONLASHON WASHINGTON, | |
| Plaintiff, | Case No. 25-cv-14364 |
| v. | Judge John F. Kness |
| JOSEPH VECCHIO, et al., | |
| Defendants. | |

**DEFENDANT CITY OF CHICAGO'S ANSWER AND
AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

Defendant City of Chicago (the "City"), by and through its undersigned counsel, for its answer and affirmative defenses to the Complaint of Plaintiff Dionlashon Washington, states as follows:

**JURISDICTION AND VENUE**

1.      This action arises under the Constitution of the United States, particularly the Fourth Amendment to the Constitution of the United States, under the laws of the United States , particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Illinois.

**ANSWER:**      The City states that, based on the representations of counsel for Plaintiff, Plaintiff is not alleging any federal *Monell* claims against the City, and Plaintiff's state law claims against the City are based solely on theories of indemnification and *respondeat superior.* As such, the City admits this lawsuit alleges against the Defendant Officers violations of the Fourth Amendment to the Constitution of the United States, the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and alleges against the Defendant Officers and City violations of the laws of the State of Illinois. The City denies the remaining allegations in Paragraph 1.

2.     The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

**ANSWER:**     The City admits the Court has jurisdiction over this matter.

3.     This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the Federal claims. Venue is proper under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

**ANSWER:**     The City admits the Court has jurisdiction over this matter and that venue is proper.

The City denies the remaining allegations contained in Paragraph 3.

## PARTIES

4.     At all times relevant herein, Plaintiff DIONLASHON WASHINGTON ("Dionlashon") was a resident of the County of Cook, State of Illinois.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4.

5.     Defendants VECCHIO, FUENTES, and TOHATAN, ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

**ANSWER:**     The City admits Defendants Vecchio, Fuentes, and Tohatan are sued in their individual capacities and employed as police officers by the City of Chicago. The remaining allegations contained in Paragraph 5 call for a legal conclusion to which no answer is required.

6.     Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois. The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment. At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants VECCHIO, FUENTES, and TOHATAN.

**ANSWER:** The City admits the allegations set forth in the first and last sentences in Paragraph 6. The remaining allegations contained in Paragraph 5 call for a legal conclusion to which no answer is required.

## FACTUAL ALLEGATIONS

7.    On September 23, 2024, at approximately 9:30 p.m., Dionlashon was in the front passenger seat of his friend Ron Hampton's car near the intersection of North Dearborn Street and West Superior Street in Chicago. Ron was looking for parking before going to the Lifetime Fitness gym, when Defendant Officers initiated their emergency lights and pulled them over.

**ANSWER:** The City admits a vehicle containing Plaintiff was pulled over on September 23, 2024 at approximately 9:30 p.m. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 7.

8.    No one in the car was committing any traffic violations.

**ANSWER:** Upon information and belief, the City denies the allegations set forth in Paragraph 8.

9.    Dionlashon and his friends are black.

**ANSWER:** The City admits, on information and belief, that Plaintiff is Black. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 9.

10.    Defendant Tohatan approached Ron's side of the vehicle and immediately said, "Hands! Let me see your hands."

**ANSWER:** The City admits that the encounter alleged in Paragraph 10 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

11.     Ron complied with Tohatan's command and placed both hands outside Ron's side window and after a brief exchange was asked to step out of the car.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 11 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

12.     Tohatan then asked Ron whether the vehicle belonged to him. He responded that it did, and Tohatan asked him for his driver's license and insurance.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 12 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

13.     Ron, visibly confused, replied that his license and insurance were in his bag in the trunk and asked what was going on.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations that "Ron" appeared visibly confused. The City further admits that the encounter alleged in Paragraph 13 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

14.     Tohatan responded that he was not wearing a seatbelt, to which Ron replied that he had just taken it off.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 14 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

15.     Tohatan instructed Ron to turn off the car and step out, telling him not to reach for anything. Ron replied that he did not have anything. Tohatan asked whether there were any weapons in the vehicle, and Ron again stated that he did not have anything.

**ANSWER:** The City admits that the encounter alleged in Paragraph 15 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

16. Despite the absence of any reason to believe Ron was armed or dangerous, Tohatan patted Ron's waist area and stated that he was detaining him for safety, but that he was not under arrest, and then proceeded to handcuff him.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations that there was an absence of any reason to believe "Ron" was armed or dangerous. The City further admits that the encounter alleged in Paragraph 16 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

17. At one point, no fewer than four squad cars were present at the scene, and at least six additional officers, aside from the Defendant Officers, were also on scene.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17.

18. Tohatan next asked the left-rear passenger to step out of the vehicle and conducted a pat-down search of him.

**ANSWER:** The City admits that the encounter alleged in Paragraph 18 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

19. Tohatan then ordered the middle-seat passenger to step out and asked her whether she had any weapons. She denied having any weapons, and Tohatan directed her to shake her sweater.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 19 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

20.     At this point, the Defendant Officers had no reasonable suspicion or probable cause to believe that Ron or any of his passengers had committed any crime.

**ANSWER:**     On information and belief, the City denies the allegations set forth in Paragraph 20.

21.     At the same time, Defendant Fuentes approached the front passenger side of the vehicle, opened the door, and told Dionlashon, who had his phone in his hand, to step out, stating, "Nothing in your hands," and "The last thing we want is for you to start reaching for stuff."

**ANSWER:**     The City admits that the encounter alleged in Paragraph 21 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

22.     Dionlashon, visibly confused, asked why he needed to step out. Fuentes responded, "Because we're telling you to, and if you don't want to come out, we'll take you to jail."

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations that Plaintiff appeared visibly confused. The City further admits that the encounter alleged in Paragraph 22 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

23.     Dionlashon complied with Fuentes's orders.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 23.

24.     Defendant Vecchio asked Dionlashon whether he had anything on him; he denied having anything, and Vecchio conducted a pat-down search.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 24 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

25.     Fuentes then directed the right-rear passenger to exit the vehicle, and Vecchio immediately handcuffed him to Dionlashon.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 25 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

26.     One of the passengers asked the Defendant Officers to explain what the issue was, and one of the officers responded, "You were double-parked and you were going in circles."

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26.

27.     The right-rear passenger asked what was going on, and Vecchio told him they were being detained for the purpose of a traffic stop.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27.

28.     Ron explained to the Defendant Officers that he and his friends were going to the nearby Lifetime Fitness.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 28.

29.     The reason the vehicle was double-parked was because Defendant officers had pulled it over.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29.

30.     Tohatan again asked Ron for his driver's license, and Ron instructed him where his wallet was in the trunk.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 30 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

31.     Tohatan returned to his squad car to run Ron's information.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 31 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

32.     Vecchio proceeded to search the vehicle, including multiple gym bags, the center console, the glove compartment, and the trunk.

**ANSWER:**     The City admits that the encounter alleged in Paragraph 32 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

33.     Vecchio searched Dionlashon's backpack that was in the front passenger area.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 33.

34.     Dionlashon did not consent to any search of his backpack or his person.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 34.

35.     Ron gave Tohatan permission to open his trunk to retrieve his driver's license, but did not consent to any searches of his car.

8

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 35.

36. After running Ron's information, Tohatan returned and asked him whether he had a FOID card. Ron responded that he did but reiterated that he had no weapons in the vehicle.

**ANSWER:** The City admits that the encounter alleged in Paragraph 36 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

37. Dionlashon and his friends were eventually unhandcuffed.

**ANSWER:** The City admits that the encounter alleged in Paragraph 37 was captured on Body Worn Camera video footage. The City states that the Body Worn Camera video footage speaks for itself and denies any allegations inconsistent with the footage.

38. No firearms were found inside the vehicle.

**ANSWER:** On information and belief, the City admits the allegations set forth in Paragraph 38.

39. Defendant Officers left the scene without initiating any charges or issuing a parking ticket.

**ANSWER:** On information and belief, the City admits the allegations set forth in Paragraph 39.

40. Defendant Officers failed to provide a stop receipt as required by the Chicago Police Department rules.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 40.

41. On information and belief, Defendant Officers failed to generate an Investigatory Stop Report as required by CPD rules.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 41.

42.     As a result of the foregoing, Dionlashon was deprived of rights secured by the Fourth Amendment to the United States Constitution, as well as Illinois law.

**ANSWER:**     On information and belief, the City denies the allegations set forth in Paragraph 42.

## DEFENDANT OFFICERS' HISTORY OF MISCONDUCT

43.     Since this incident, Defendants Vecchio, Fuentes, and Tohatan have been relieved of their police powers due to multiple investigations into serious allegations of police misconduct.

**ANSWER:**     The City admits Defendants Vecchio, Fuentes, and Tohatan have been relieved of their police powers. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 43.

44.     Defendants Officers already have extensive histories of sustained allegations of misconduct.

**ANSWER:**     The City admits Defendants Vecchio, Fuentes, and Tohatan have sustained allegations of misconduct. The City denies the remaining allegations set forth in Paragraph 44.

45.     Defendant Officers were all members of the 1863 tactical team, which has been the subject of numerous investigations by the Civilian Office of Police Accountability ("COPA").

**ANSWER:**     The City admits Defendant Officers Vecchio, Fuentes, and Tohatan were members of the Chicago Police Department's District 18 tactical team and that COPA has investigated members of District 18's tactical team. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 45.

46.     In December 2024, COPA sent a memorandum to the Chicago Police Department identifying patterns of concern involving Defendant Officers and the 1863 tactical team. These included "unprofessional and disrespectful conduct towards civilians, including the use of profanities, insults, and threats of force"; the use of pretextual traffic stops for reasons such as stopping too far away from the curb, stopping in a non-parking zone, and seatbelt violations"; and

"a consistent failure to adhere to CPD policies regarding the documentation and recording of civilian/police encounters, including to complete ISRs and TSSS cards, failing to provide ISR receipts, and late BWC activations."

**ANSWER:** The City admits COPA sent a letter to Michael Barz, 18th District Commander on December 27, 2024, "Re: Concern Related to 18th District Tactical Team Activities." The City states that the COPA letter speaks for itself and denies any allegations inconsistent therewith.

47. In October 2025, COPA issued a separate memorandum to CPD regarding Vecchio, recommending that Vecchio be relieved of his police powers pending the resolution of COPA's investigations.

**ANSWER:** The City admits COPA sent a letter to CPD Superintendent Larry Snelling on October 6, 2025, "Re: RELIEF OF POWERS Officer Joseph Vecchio, Star #14469." The City states that the COPA letter speaks for itself and denies any allegations inconsistent therewith.

48. COPA also noted that Vecchio had the highest number of complaints – also known as log numbers – in the Chicago Police Department (76 log numbers), Tohatan had the third-highest number of complaints (46 log numbers), and Fuentes had the fourth-highest number of complaints (43 log numbers).

**ANSWER:** The City admits COPA sent a letter to CPD Superintendent Larry Snelling on October 6, 2025, "Re: RELIEF OF POWERS Officer Joseph Vecchio, Star #14469." The City states that the COPA letter speaks for itself and denies any allegations inconsistent therewith.

49. The average Chicago Police Department member has 3.5 log numbers.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 49.

50. The majority of the complaints and investigations involve allegations of unjustified traffic stops, arrests, searches, and disrespectful or unprofessional conduct.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 50.

51.     Additionally, COPA is investigating cases in which Vecchio allegedly provided false statements and/or testimony. Both incidents involved traffic stops during which Vecchio recovered a firearm during a vehicle search.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 51.

## LAWSUITS AGAINST DEFENDANT OFFICERS

52.     Defendant Officers are no strangers to being accused of unlawful conduct similar to the conduct described in this complaint.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 52.

53.     In *Wilson v. Vecchio* (24-cv-12371), Defendant Vecchio was accused of approaching the plaintiff's stopped car for a minor parking violation, unlawfully searching the plaintiff's vehicle, unlawfully detaining the plaintiff, using excessive force against the plaintiff, and denying the plaintiff equal protection.

**ANSWER:**     The City admits the lawsuit *Wilson v. Vecchio* (24-cv-12371) was filed and that Defendant Vecchio was named a defendant, wherein certain allegations were made, and the pleadings speak for themselves. To the extent this Paragraph alleges Defendant Vecchio was found liable for any of the allegations in *Wilson*, the City denies such allegations.

54.     The City settled *Wilson* for $80,000.

**ANSWER:**     The City admits the allegation in Paragraph 54.

55.     In *Northington v. Tohatan et al.* (24-cv-11466), Defendants Tohatan, Vecchio, and Fuentes were accused of approaching the plaintiff's stopped car for a minor parking violation, pulling him out of his car, handcuffing and detaining him, searching his car, mocking, insulting, and threatening him before walking away and authoring a falsified stop report.

**ANSWER:**     The City admits the lawsuit *Northington v. Tohatan, et al* (24-cv-11466) was filed and that Defendants Tohatan, Vecchio, and Fuentes were named as defendants, wherein certain allegations were made, and the pleadings speak for themselves. To the extent this Paragraph

alleges Defendants Tohatan, Vecchio, or Fuentes were found liable for any of the allegations in *Northington*, the City denies such allegations.

56. The City settled *Northington* for $80,000.

**ANSWER:** The City admits the allegation set forth in Paragraph 56.

57. In *Ipaye v. City of Chicago et al.* (24-cv-8958), Defendants Vecchio and Tohatan were accused of searching the plaintiff's vehicle and person without consent or probable cause.

**ANSWER:** The City admits the lawsuit *Ipaye v. City of Chicago et al* (24-cv-8958) was filed and that Defendants Vecchio and Tohatan were named as defendants, wherein certain allegations were made, and the pleadings speak for themselves. To the extent this Paragraph alleges Defendants Vecchio or Tohatan were found liable for any of the allegations in *Ipaye*, the City denies such allegations.

58. The City settled *Ipaye* for $80,000.

**ANSWER:** The City admits *Ipaye* was settled. The City denies the remaining allegations set forth in Paragraph 58.

59. In *Haley v. Tohatan, et al.* (22-cv-1785), Defendant Tohatan was accused of unlawful search and seizure after he and another officer approached a stopped vehicle on West Erie Street on December 8, 2021.

**ANSWER:** The City admits the lawsuit *Haley v. Tohatan* (22-cv-1785) was filed and that Defendant Tohatan was named a defendant, wherein certain allegations were made, and the pleadings speak for themselves. To the extent this Paragraph alleges Defendant Tohatan was found liable for any of the allegations in *Haley*, the City denies such allegations.

60. The plaintiff in Haley alleged that Tohatan ordered him out of his car, handcuffed him, and searched his car despite there being no probable cause or reasonable suspicion of any criminal conduct.

**ANSWER:** The City admits the lawsuit *Haley v. Tohatan* (22-cv-1785) was filed and that Defendant Tohatan was named a defendant, wherein certain allegations were made, and the pleadings speak for themselves. To the extent this Paragraph alleges Defendant Tohatan was found liable for any of the allegations in *Haley*, the City denies such allegations.

61.    The City settled *Haley* for $38,000.

**ANSWER:** The City admits the allegations set forth in Paragraph 61.

62.    In *Partee v. Hasan* (19-cv-3689), Defendant Tohatan and two other officers were accused of handcuffing the plaintiff and searching his car despite the fact that the plaintiff had done nothing illegal.

**ANSWER:** The City admits the lawsuit *Partee v. Hasan* (19-cv-3689) was filed and that Defendant Tohatan was named a defendant, wherein certain allegations were made, and the pleadings speak for themselves. To the extent this Paragraph alleges Defendant Tohatan was found liable for any of the allegations in *Partee*, the City denies such allegations.

63.    The City settled *Partee* for $40,000.

**ANSWER:** The City admits *Partee* was settled. The City denies the remaining allegations set forth in Paragraph 63.

64.    In *Farris v. City of Chicago et al*. (22-cv-1729), Defendants Tohatan and Fuentes were accused of excessive force, unlawful search, wrongful detention, and malicious prosecution after they approached a stopped vehicle.

**ANSWER:** The City admits the lawsuit *Farris v. City of Chicago et al* (22-cv-1729) was filed and that Defendants Tohatan and Fuentes were named as defendants, wherein certain allegations were made, and the pleadings speak for themselves. To the extent this Paragraph alleges Defendants Tohatan or Fuentes were found liable for any of the allegations in *Farris*, the City denies such allegations.

14

65.     The City settled *Farris* for $100,000.

**ANSWER:**     The City admits the allegations set forth in Paragraph 65.

66.     In *Garcia v. Vecchio et al.* (25-cv-13109), Defendants Vecchio, Tohatan, and Fuentes are accused of unlawfully searching the plaintiff without reasonable suspicion or probable cause.

**ANSWER:**     The City admits the lawsuit *Rodriguez v. Vecchio* (25-cv-13109) was filed and that Defendants Vecchio, Tohatan and Fuentes were named as defendants, wherein certain allegations were made, and the pleadings speak for themselves.

67.     The *Garcia* lawsuit remains pending.

**ANSWER:**     The City admits the allegation set forth in Paragraph 67.

68.     In *Quinn v. Vecchio et al.* (25-cv-10782), Defendants Vecchio is accused of searching the plaintiff's vehicle without consent or probable cause leading to plaintiff's false arrest. Vecchio is accused of falsifying reports and offering perjured testimony regarding the stop.

**ANSWER:**     The City admits the lawsuit *Quinn v. Vecchio, et al,* (25-cv-10782) was filed and that Defendant Vecchio was named as a defendant, wherein certain allegations were made, and the pleadings speak for themselves.

69.     The *Quinn* lawsuit remains pending.

**ANSWER:**     The City admits the allegation set forth in Paragraph 69.

70.     The cases cited above are just the tip of the iceberg when it comes to lawsuits against Chicago police for unlawful stops and searches.

**ANSWER:**     The City denies the allegations set forth in Paragraph 70.

71.     The city has paid millions of dollars in settlements of lawsuits alleging unlawful traffic and investigatory stops and illegal searches.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 71.

72.     As just one example, the City's Law Department agreed to pay the family of Dexter Reed $1.25 million to settle their lawsuit arising from an illegal, pretextual stop of Reed by Chicago police which resulted in the death of Reed and the wounding of an officer.

**ANSWER:** The City denies the allegations set forth in Paragraph 72.

## DEFENDANT VECCHIO'S DISCPLINARY HISTORY

73.     Defendant Vecchio has been disciplined for similar conduct in the past.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73.

74.     COPA sustained numerous allegations against Vecchio, including a domestic incident that resulted in a 15-day suspension, and two cases involving reporting/documentation violations that resulted in a 2-day suspension and a reprimand.

**ANSWER:** The City admits COPA has sustained allegations against Defendant Vecchio and recommended disciplinary actions that include days of suspension and reprimands.

75.     Further, Vecchio's closed log number investigations reveal preliminary findings of misconduct in more than half of his cases.

**ANSWER:** On information and belief, the City denies the allegations set forth in Paragraph 75.

## DEFENDANT FUENTES' DISCIPLINARY HISTORY

76.     Defendant Fuentes has been disciplined for similar conduct in the past.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76.

77.     On May 30, 2023, COPA sustained allegations against Defendant Fuentes and another officer of using profanity against a civilian at a traffic stop, unlawfully detaining the civilian, and unlawfully impounding the civilian's vehicle.

**ANSWER:**    The City admits that, on or about May 30, 2023, COPA sustained allegations made

in Log #2022-0401.

78.    During the incident, Fuentes ordered Ron out of the car and handcuffed him, telling
him his car would be towed. Fuentes yelled at the man, "Your $50,000 car is my car now! No, no,
it's my car now! It's my car now! My car now! My car!"

**ANSWER:**    The City admits that COPA investigated a complaint against Defendant Fuentes,

among others, (Log #2022-0401) wherein certain allegations were made, and the complaint and

investigation speak for themselves.  The City lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations contained in Paragraph 78.

79.    Fuentes later claimed he searched the car because he smelled burnt cannabis. But
the search yielded no narcotics or other contraband.

**ANSWER:**    The City admits that COPA investigated a complaint against Defendant Fuentes,

among others, (Log #2022-0401) wherein certain allegations were made, and the complaint and

investigation speak for themselves.  The City lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations contained in Paragraph 79.

80.    The officers issued the civilian a citation for parking in a tow zone, and ordered his
car towed under a provision of the City of Chicago ordinances that authorized towing "[w]hen an
unattended vehicle is parked illegally" in a marked tow zone.

**ANSWER:**    The City admits that COPA investigated a complaint against Defendant Fuentes,

among others, (Log #2022-0401) wherein certain allegations were made, and the complaint and

investigation speak for themselves.  The City lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations contained in Paragraph 80.

81.    The civilian was found "not liable" by the administrative law judge on his citation
– presumably because his car was not unattended.

**ANSWER:**     The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 81.

82.     COPA recommended that Fuentes receive a 45-day suspension for his conduct.

**ANSWER:**     The City admits the allegations set forth in Paragraph 82.

83.     The Chicago Police Department concurred with COPA's findings but felt Defendant Fuentes should receive only a 10-day suspension.

**ANSWER:**     The City admits the Chicago Police Department concurred with COPA's findings but did not concur with the recommended penalty. The City further admits that the Department recommended a penalty of a 10-day suspension for Defendant Fuentes.

84.     On January 16, 2024, COPA sustained allegations that Defendant Fuentes "made insulting, mocking and belittling statements" toward two civilians at a traffic stop, and that he arrested a civilian and impounded his vehicle as retaliation for the civilian looking at Fuentes' identification.

**ANSWER:**     The City admits that COPA investigated a complaint against Defendant Fuentes (Log #2021-0000013) wherein certain allegations were made, and the complaint and investigation speak for themselves.  The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 84.

85.     At several points during the stop, Fuentes told the civilians that they were "ignorant as fuck" and commented to a fellow officer that one of the civilians was a "jag," which Fuentes later admitted was shorthand for "jagoff."

**ANSWER:**     The City admits that COPA investigated a complaint against Defendant Fuentes (Log #2021-0000013) wherein certain allegations were made, and the complaint and investigation speak for themselves.  The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 85.

86.     When Fuentes observed the civilian looking at his star number and squad car, Fuentes said, "You are not going to size me up like that, looking at my star number and my vehicle number."

**ANSWER:**     The City admits that COPA investigated a complaint against Defendant Fuentes (Log #2021-0000013) wherein certain allegations were made, and the complaint and investigation speak for themselves.  The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 86.

87.     The COPA investigator noted in his report that "[d]espite Fuentes claiming in his interview that he felt [one of the civilians] was disrespectful and did not respect their authority, only Fuentes is captured acting in a disrespectful manner."

**ANSWER:**     The City admits that COPA investigated a complaint against Defendant Fuentes (Log #2021-0000013) wherein certain allegations were made, and the complaint, investigation, and reports speak for themselves.

88.     COPA recommended a 10-day suspension for Fuentes as a result of his conduct.

**ANSWER:**     The City admits the allegations set forth in Paragraph 88.

89.     On January 23, 2024, COPA sustained allegations that Defendant Fuentes and another officer used profanity and racist language toward African-American civilians during a traffic stop.

**ANSWER:**     The City admits that COPA investigated a complaint against Defendant Fuentes (Log #2021-4460) wherein certain allegations were made, and the complaint and investigation speak for themselves.  The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 89.

90.     During the traffic stop, Fuentes told another officer, "I'm tired of these fucking people acting like animals, dude," and referred to the civilians as "fucking animals."

**ANSWER:**     The City admits that COPA investigated a complaint against Defendant Fuentes (Log #2021-4460) wherein certain allegations were made, and the complaint and investigation

speak for themselves. The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 90.

91. Fuentes' conduct was captured on body-worn camera footage.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in Paragraph 91.

92. COPA recommended a suspension of up to 30 days for Fuentes.

**ANSWER:** The City admits the allegations set forth in Paragraph 92.

93. On April 5, 2024, the Chicago Police Department concurred with COPA's findings and its recommended penalty of a 30-day suspension for Defendant Fuentes.

**ANSWER:** The City admits the allegations set forth in Paragraph 93.

## DEFENDANT TOHATAN'S DISCIPLINARY HISTORY

94. On November 27, 2018, COPA sustained allegations that Defendant Tohatan engaged in an unjustified verbal altercation with a civilian, illegally searched the civilian's car, and improperly issued a citation to the civilian for no proof of insurance despite the civilian offering to show him proof of insurance on his phone.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 94.

95. The incident began when Tohatan and another officer pulled the civilian over after doing a U-turn.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 95.

96. COPA recommended a 7-day suspension for Defendant Tohatan.

**ANSWER:** The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 96.

97.    On August 25, 2020, COPA sustained an allegation that Defendant Tohatan engaged in verbal abuse.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 97.

98.    Tohatan was suspended for 5 days as a result of his misconduct.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 98.

99.    On December 20, 2022, COPA sustained allegations that Defendant Tohatan engaged in verbal abuse and profanity.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 99.

100.    Defendant Tohatan was suspended for 5 days as a result of his misconduct.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 100.

101.    On April 11, 2023, COPA sustained allegations that Defendant Tohatan engaged in an undisclosed civil rights violation.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 101.

102.    Tohatan was reprimanded for his misconduct.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 102.

103.    On December 14, 2023, COPA sustained allegations that Defendant Tohatan engaged in undisclosed misconduct during a traffic stop.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 103.

104.    On an unknown date, COPA sustained allegations against Defendant Tohatan of Coercion Threat of Arrest/Charges Coerced Confession.

**ANSWER:**    The City lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 104.

105.    The discipline cited above is just the tip of the iceberg when it comes to discipline against Chicago police officer for unlawful stops and searches and verbal abuse of civilians.

**ANSWER:**    The City denies the allegations set forth in Paragraph 105.

## **AFFIRMATIVE DEFENSES**

The City states the following affirmative defenses to Plaintiff's Complaint:

1.    To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff has a duty to mitigate, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in the case.

2.    To the extent any damages claimed by Plaintiff were proximately caused, in whole or in part, by Plaintiff's actions, any verdict or judgment obtained by Plaintiff must be reduced by application of the principles of comparative fault, by an amount commensurate with the degree of fault attributed to Plaintiff by a jury in this matter.

3.    Defendant City is not liable to the Plaintiff for any federal or state law claims for which its employees or agents are not liable to the Plaintiff. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); 745 ILCS 10/2-109 (1994).

4.      A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable. 745 ILCS 10/2-109. Because Officer Defendants were employed by the City at the time of the incident and the officers are not liable to Plaintiff, Defendant City is immune from liability.

5.      Under Section 201 of the Illinois Tort Immunity Act ("Tort Immunity Act"), Defendants are not liable for injuries arising out of the exercise of discretionary acts pursuant to 745 ILCS 10/2- 201 (2006) and, therefore, the City cannot be held liable pursuant to 745 ILCS 10/2-109.

6.      As to any state law claim alleged by Plaintiff, a public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct. 745 ILCS 10/2-202. Officer Defendants are public employees and their respective acts and omissions rendered at all times material to the events alleged in Plaintiff's Complaint were neither willful nor wanton, thus, Officers Defendants have immunity from Plaintiff's claims and, therefore, the City cannot be held liable pursuant to 745 ILCS 10/2-109.

7.      Plaintiff is not entitled to attorney's fees for his state law claims. *See In re Weinschneider*, 395 F.3d 401, 404 (7th Cir. 2005).

8.      The City is not liable for punitive damages under both 42 U.S.C. § 1983 and state law. Moreover, under Illinois law, the City cannot be required to indemnify an employee for punitive damages, nor may it pay a judgment for punitive damages. *See City of Newport v. Facts Concerts*, 453 U.S. 247, 271 (1981); *see also* 745 ILCS 10/2-102.

23

## PRAYER FOR RELIEF

Defendant City of Chicago prays that this Court enter judgment in its favor and against Plaintiff in all respects, award the City attorney's fees and costs, to the extent allowed by law, and provide such other relief that this Court deems proper.

## JURY DEMAND

The City respectfully requests a trial by jury.

Dated: February 10, 202

Respectfully submitted,

**CITY OF CHICAGO**

By: *s/Michael P. Sheehan*
One of Its Attorneys

Michael P. Sheehan (msheehan@taftlaw.com)
Barton J. O'Brien (bobrien@taftlaw.com)
Joan E. Ahn (jahn@taftlaw.com)
Sara J. Schroeder (sschroeder@taftlaw.com)
Henry Byrne (hbyrne@taftlaw.com)
Taft Stettinius and Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, Illinois 60601
Telephone:     (312) 527-4000

*Counsel for Defendant City of Chicago*

197732543v5

24